Estate of Adolph J. Koch, George Koch, Executor v. Commissioner.
Estate of Koch v. Commissioner
Docket No. 108007.
United States Tax Court
1943 Tax Ct. Memo LEXIS 363; 1 T.C.M. (CCH) 898; T.C.M. (RIA) 43170; April 13, 1943
*363 Gerald S. Chargin, Esq., for the petitioner. Arthur L. Murray, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: This proceeding involves a deficiency in estate tax in the amount of $22,544.18. Respondent determined that decedent had made transfers, in contemplation of death and within two years prior to his death, of property having an aggregate value of $204,442.51. He included this amount in gross estate under section 811 (c) of the Internal Revenue Code. Inasmuch as $79,001.53 of the amount referred to had been transferred by decedent to a trust for the benefit of his grandson, this amount was also determined to be includible in gross estate under section 811 (d) of the Internal Revenue Code. Petitioner contends that neither determination is correct. Two other issues were raised by the pleadings. One relates to the refusal of the respondent to allow the deduction of $500, alleged to be an additional sum payable to decedent's housekeeper and nurse. The other, not referred to in the notice of deficiency but set out in the petition, relates to an anticipated expenditure for attorney's fees in this proceeding. These issues appear to have been *364 abandoned since neither is discussed by petitioner upon brief; but if they have not been abandoned they must be decided against petitioner for failure to present any evidence in support of them. Findings of Fact Adolph J. Kock, hereinafter referred to as the decedent, died testate on June 29, 1939, at the age of 84 years. He was then a resident of San Jose, California. His son, George A. Koch, is the duly qualified executor of his estate. An estate tax return was filed with the collector of internal revenue for the first district of California on October 19, 1939. It states that the "business or occupation" of decedent at the time of his death was "retired". Decedent's wife, Elizabeth Koch, predeceased him. He was survived by a son, George A. Koch, and two grandsons, Kenneth Koch, the son of George, and Ralph J. Swickard, the son of his daughter, Hilda. Ralph's mother died at the time of, or shortly after, his birth. The decedent and his wife, after the death of their daughter, supported in their household their grandson, Ralph, until he reached the age of seventeen or eighteen years, when he went to live with his father, his stepmother and her son by a prior marriage. Decedent *365 was very anxious that Ralph should have the best educational advantages, and that he should go to Stanford University where his other grandson, Kenneth, was a student. Ralph entered Stanford University in the fall of 1938, and on September 21, 1938, the decedent gave him a check for $500 for his tuition. This amount is not in issue in this proceeding. The decedent was a man of considerable means. Between 1913 and 1938 he made several gifts to his son George. In 1913 he gave him some flats, valued at $30,000, for a wedding present. Between 1913 and 1930 he gave him at least $10,000. In 1930 he gave him $40,000 to enable him to go into the stock and bond business. None of these amounts is in issue in this proceeding. During the latter part of 1931 or the early part of 1932 decedent told his attorney that he was planning to make a gift to his son George of approximately $100,000 in securities, because the latter had sustained substantial losses in the failure of the stock and bond firm of which he had been a partner. The attorney advised that because of the failure of the firm George had a contingent liability and would probably lose any property which might be transferred outright *366 to him at that time. He therefore recommended that decedent make a will in which any property intended for George would be tied up so that his creditors could not reach it. Following this advice, the decedent, on February 23, 1932, executed a will which provided that, in the event of his death, the inheritance intended for George would remain in a spendthrift trust. After George was discharged in bankruptcy of debts amounting to about $1,000,000, the decedent, on July 25, 1935, executed another document which, with codicils, became his last will and testament. He provided therein for three specific bequests, $5,000 to his brother and $1,000 each to his sister-in-law and niece. The remainder of his property was devised and bequeathed to his son George and his grandson, Ralph. Ralph's half was to be held in trust by George, the latter being directed to pay out of the income such amounts as he should deem necessary for the support, maintenance and education of Ralph until he should reach the age of twenty-one years, at which time one fourth of the trust estate was to be delivered to him. The trustee was given the power in his discretion to deliver the remainder of the trust property *367 to the beneficiary at any time after he had reached the age of twenty-five years, and, if he did not exercise this discretion, the trust was to cease and terminate when Ralph reached the age of thirty years, at which time he was to receive all of the trust property remaining in the hands of the trustee. This will was amended by a codicil dated March 3, 1937, which made certain changes in the time when part or all of the trust estate was to be delivered to Ralph by the trustee. On December 20, 1938, decedent made an absolute gift to his son of property which, on the date of the decedent's death, had a value of $79,290.98. On the same date decedent made a gift in trust for the benefit of his grandson Ralph of properties which, on the date of decedent's death, had a value of $79,001.53. Decedent's son George was named as trustee in the trust instrument. Under its provisions he was directed to pay out of the Income of the trust such amounts as he deemed necessary for the support, education and maintenance of Ralph until he became twenty-one years of age, and thereafter he was to pay Ralph the income of the trust until he reached the age of twenty-five, at which time all of the trust *368 property was to be turned over to him and the trust was to terminate. No power to change, alter or amend the trust was reserved in the settlor. Decedent, during the month of January, 1939, made absolute gifts to George and Ralph of cash and other properties, the value of which on the date of his death was $23,150 and $21,000 respectively. The decedent paid Federal gift taxes on the gifts referred to above in the amounts of $7,547.06 for 1938 and $5,374.12 for 1939. Additional codicils were added by the decedent to his will on December 24, 1938, January 18, 1939, and February 9, 1939. They referred to the specific bequests in his will of $1,000 each to his sister-in-law and niece, and $5,000 to his brother, stated that these amounts had been given to them on the respective dates, and that they were advancements made "in lieu of" and "in payment of" the bequests during his lifetime. After making these transfers, which amounted to $209,442.51, the decedent retained, until the time of his death, cash and other properties having a total value of $142,605.39. About five or six years prior to his death, the decedent, while crossing a street in San Jose, California, was struck by an *369 automobile. The injury sustained by him probably broke a muscle and caused an inside hemorrhage over his right hip. During the six or eight weeks following the accident, the attending physician withdrew from the injured side several quarts of fluid. The injury left the decedent with a large depression in his right side, and thereafter the side bothered him. At times he would say: "This automobile injury has come back on me." He complained of having a "rheumatism pain", and had an electric ring which he sat on and put around him. He said the ring soothed and helped him. Prior to the automobile accident the decedent had always enjoyed good health, had never been bedridden or hospitalized, and had seldom required the attention of a physician. On May 18, 1938, the decedent had a paralytic stroke, and, for a time, was unable to use his left hand and left lower extremity. He had fallen, while alone, but had managed to get to his bed where he was found by his housekeeper and nurse, who called the doctor. The nurse told the doctor that the decedent's son wanted him to visit the decedent every day so she could tell him (he residing in another city) how his father was getting along. During *370 the period from May 21 to June 22, 1938, the doctor visited the decedent twenty-eight times. At the time of his last call, on June 22, 1938, decedent's left leg had improved and he was able to stand by the bed with the use of crutches for support. He was not able to walk unassisted at that time. For a while he had to have someone help him into his automobile when he went riding. His condition improved, however, and his limp "cleared up almost entirely." Decedent was a member of the Knights Templar organization, and it furnished him with a wheel chair, which was kept in his garage. The wheel chair was used some; but decedent did not like to ride in it and his nurse did not like to push it. He was very independent, often refused proffered assistance, and at times walked without his cane. After his illness in 1938 the decedent spent much of his time sitting on the porch of his home or in the front room, looking out of the window. He usually retired early and got up early. He was always in good spirits and never talked about death. He was a director of a building and loan association, and during the year 1938, missed only two of the monthly meetings of the directors. He participated *371 actively in the discussions at these meetings. In the early part of 1939, he visited the offices of the association "a couple of times" and on at least one occasion told the counsel for the association that he had walked down. The office was five blocks from decedent's residence. During 1939, decedent shaved himself with an electric razor, and had his hair cut at a barber shop approximately once every three weeks. He frequently walked to the barber shop, which was a block from his home. On the night before Christmas of 1938, decedent walked down to the Masonic Temple with his housekeeper and nurse. He personally attended to all the details of the Christmas breakfast of the Knights Templar organization, of which he was in charge, and took great pains to see that all of the tables were fixed right, that the ladies waited on the tables, and that the hams were cut right. He also made a little talk to the members. He attended the Christmas breakfast in a wheel chair. His nurse "took him down" to the Masonic Temple where the breakfast was served. From June 22, 1938, until the date of his death the decedent was not treated by any doctor, except that on December 26, 1938, he received treatment *372 for an inflamed eye. The decedent died on June 29, 1939. The cause of death was extra peritoncal hemorrhage due to rupture of the left hypogastric artery, which could have been caused by a fall in the bathroom the morning of his death. Contributory causes were chronic interstitial nephritis with cystic degeneration of the right kidney and senility. The contributory causes, other than senility, were revealed by an autopsy. The decedent had never complained of, or been treated for, the conditions disclosed by the autopsy. The respondent determined that all of the gifts and transfers made by the decedent during the period December 20, 1938, to the date of his death, except the $5,000 given to his brother, were made in contemplation of death. He therefore increased the gross estate by the aggregate amount thereof ($204,442.51). The transfers by the decedent, aggregating $204,442.51, were made in contemplation of death. Opinion The principal issue is whether respondent erred in determining that the transfers were made in contemplation of death and hence that the value of the property transferred is to be included in gross estate under section 811 (d) of the Internal Revenue Code. *373 [1] The question is essentially one of fact, to be determined from a consideration of all the pertinent facts and circumstances, First National Bank of Boston v. Commissioner, 63 Fed. (2d) 685; Flack v. Holtagel, 93 Fed. (2d) 512; but the respondent has the advantage of two rebuttable presumptions - one, that his determination is correct, Wickwire v. Reinecke, 275 U.S. 101; Welch v. Helvering, 290 U.S. 111 [3 USTC, and the other given by the statute, since the transfers were of a material part of decedent's property and were made by him without consideration within two years prior to his death. *374 Finding has been made that the transfers were in contemplation of death. Conclusion must therefore be reached that the respondent committed no error in including the value of the property in decedent's gross estate. The evidence, in our judgment, clearly supports the finding, independent of the presumptions to which reference has been made. A brief resume of the evidence and the principles established by decided cases will not be amiss. "Contemplation of death", as used in the statute, requires that the triers of fact apply a subjective test and attempt to ascertain from the available facts "the state of mind" of a donor whose lips have been sealed by death. United States v. Wells, 283 U.S. 102. Decided cases, at best, are of comparatively slight aid; for the facts are varied as the personalities of the donors. Collectively they suggest that all proper evidence, even circumstantial, should be considered, Farmers' Loan & Trust Co. v. Bowers, 68 Fed. (2d) 916, certiorari denied 293 U.S. 565; and "hardly any fact is too minute for consideration." Paul, Federal Estate and Gift Taxation, p. 244 *375 and note. "The differentiating factor must be found in the transferor's motive. * * * the motive which induces the transfer must be of the sort which leads to testamentary disposition." "There can be no precise delimitation of the transfers embraced within the conception of transfers in 'contemplation of death' as there can be none in relation to fraud, undue influence * * * or other familiar legal concepts * * *." United States v. Wells, supra. What was decedent's motive in making transfers of approximately 60 percent of his properties when he was nearly 84 years of age? Petitioner urges that the purpose of the transfer to the grandson, Ralph, was to make certain that he would get a college education at Stanford University and to set him up in business later. The purpose of the transfer to the son, George, is said to have been to carry out a policy, long pursued by decedent, of making liberal gifts to him during his lifetime and to equalize the gifts to him with the gifts to the grandson. No attempt is made to explain his motive in advancing the time of payment of the $1,000 bequests to his sister-in-law and niece. Respondent insists that the transfers *376 were made at a time when advanced age and incapacitation must have suggested to decedent that the end was drawing near, that they were strictly in accordance with the intention indicated by him in his last will, and that they were testamentary in character. There is no dispute concerning the value of the transferred properties.Twelve witnesses, including three physicians, several neighbors of decedent, his son, his attorney, and his housekeeper and nurse, testified at length with reference to his physical condition, his activities, and statements made by him both before and after the transfers were made. There is some conflict in the testimony of these witnesses with reference to whether the decedent was hit on the right or the left side at the time of the automobile accident, and the nature of his illness in 1938. The evidence indicates that the decedent's injuries as a result of the automobile accident were to his right side and we have so found. It is also clear that the decedent suffered a paralytic stroke in May, 1938, which affected the left side of his body; and, while he had partially recovered from it, the after effects, together with the disability resulting from the automobile *377 accident and general senility, had caused him to become pretty much of an invalid. The burden was on the petitioner to show that decedent's gifts in December, 1938, and January, 1939, were motivated by impulses primarily associated with life. United States v. Wells, supra. There is very little evidence in the record upon which to rest a finding that any of his gifts were in this category. The implication from most of the evidence is to the contrary. In his will executed in 1935, decedent, after making specific bequests of $1,000 each to his sister-in-law and niece and $5,000 to his brother, provided that one half of the residue of his estate should go to his son and that the other one half should go to a trust created for the benefit of his grandson, Ralph. The gifts made by him in December, 1938, and January, 1939, made the same disposition of approximately sixty percent of his properties. His sister-in-law, niece and brother each received the same amount that would have been received under the will; and absolute gifts of securities having a value of $102,440.28 were made to George, while securities having a value of $100,001.53 were transferred to, *378 or for the benefit of, Ralph. The time and manner in which the transfers were made indicate that they were substitutes for testamentary dispositions of decedent's property. In the case of the gifts to his sister-in-law, niece and brother, he was careful to point out that they were "in lieu of" the provisions made for them in his will. It was unnecessary to make similar statements concerning the gifts to his son and grandson since the will provided that each was to receive one half of the residue of his estate and any transfers made to them during decedent's lifetime merely diminished the residuary estate. It is a significant fact, however, that the decedent followed the intention expressed in his will of dividing his property, per stirpes. Examining in more detail the contentions made by petitioner and the evidence relied upon in support of them, it will be noted that Ralph entered Stanford University in the fall of 1938, at which time decedent gave him a check for $500 to pay his tuition. Ralph's age at that time is not shown; but it is obvious he was less than twenty-one. Decedent must have known, in the latter part of 1938, that Ralph had no immediate need for any large *379 sum of money and that several years would elapse before he could embark on a business career. So long as decedent lived he was in a position to furnish Ralph with funds required, either for his education or for business. He had made adequate provision in his will to take care of Ralph's needs after his death. We do not doubt that decedent wanted Ralph to become "a good business man and not a fiddler," as some of the witnesses stated, and that his intention was to make Ralph "absolutely independent". That, however, does not satisfactorily explain why he should have advanced the time of enjoyment by Ralph of such a substantial portion of his property. The record is devoid of any intimation that he was endeavoring to school his grandson in the handling of money and inference is to the contrary; for the major portion of the property given to him was to be administered by his uncle, as trustee, and the trustee was to pay out of the income only such amounts as he should deem necessary for the boy's "support, education and maintenance." Inasmuch as the trust then created for Ralph was in essence the same as the trust which was to be set up after decedent's death, it is difficult to see why *380 it was created, if it were not for the reason determined by the respondent. The gifts to the son seem to be in the same category. Petitioner urges that one reason for the gifts to him was decedent's desire to give him an amount equal to that given to Ralph. An intention to divide his estate equally between George and Ralph is clearly evidenced by the terms of decedent's will; and the fact that he provided each should receive approximately the same amount of his property when he made the gifts in December, 1938, and January, 1939, shows that there was no change in this plan. This, however, does not explain the decedent's motive in advancing the time of the enjoyment of George's share of his property. The contention that the gifts to the son were but a continuation of a policy of more than thirty years of making liberal gifts to him is also not proved. It is true that decedent had given George $30,000 as a wedding present in 1913, $10,000 some time between 1913 and 1930, and $40,000 when he went into business in 1930; but there is no evidence that the decedent had made any gifts to George after 1930 until the gifts now in issue were made. In our judgment the gifts to George in 1938 *381 and 1939 cannot be attributed to any long continued policy or practice. They, like the gifts to Ralph, appear rather to have been made as substitutes for and in lieu of testamentary disposition of his property. Petitioner attempted to picture decedent as being in good physical condition during the latter part of 1938 and the early part of 1939 when the gifts were made. Some of the evidence relied upon is that with reference to the Christmas party of the Knights Templar, the fact that he attended some of the meetings of the board of directors of the building and loan association, made some trips to the barber shop, was able to get about his home, and took a few automobile rides. An examination of all of the evidence in connection with these events militates against petitioner. Thus, the record shows that the breakfast was attended in a wheel chair and that the decedent was then suffering from the effect of the partial stroke as well as from the earlier automobile accident. On some of the occasions when he attended the directors' meetings he was brought there in an automobile furnished by the association. When he determined to make the gifts in December of 1938 he had George secure *382 the stocks and bonds from his safety deposit box and bring them to him at the house. He then had George call his attorney on the phone and in response thereto the attorney called at decedent's home to discuss with him the details of the trust which he intended to create for Ralph. On at least some of the trips to the barber shop the decedent was assisted by his housekeeper and nurse. It is no doubt true that decedent was of a jovial disposition and did not discuss death at any length with those with whom he associated; but he must have known that the sands of life were fast running out, that his life expectancy was short and that it was highly desirable his house be put in order. He was almost 84 years of age when the gifts were made - his exact age at the time of death was 84 years, 3 months and 5 days - and was spending most of his time in a chair on the porch or at the front window of his home. The normal activities of a busy life had all but ceased. He was tax conscious, as is indicated by the fact that he deliberately divided the gifts between 1938 and 1939 in order to minimize his tax liability. It would be closing our eyes to the obvious to hold that thoughts of death did not *383 enter into his mind and motivate the transfers. While age alone is not a decisive test, Flack v. Holtagel, supra, it may well tip the scales where other facts strongly point to testamentary disposition. The present record, in our judgment, supports respondent's determination that the gifts made by decedent in December, 1938, and January, 1939, were in contemplation of death as that term is defined in United States v. Wells, supra. We therefore respectfully decline to disturb it. In view of the conclusion which has been reached, it is unnecessary to discuss or decide the second question, i.e., whether the value of the property transferred in trust on December 20, 1938, should be included in the gross estate of decedent under the provisions of section 811 (d) of the Internal Revenue Code. Judgment will be entered for the respondent. Footnotes
1. SEC. 811. GROSS ESTATE The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States. * * * * *
(c) Transfers in Contemplation of, or Taking Effect at Death. - To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter:↩